Good morning, ladies and gentlemen. Our first case for argument this morning is United States v. Granger. Ms. Eisenman. Thank you, Judge. And may it please the Court, Vanessa Eisenman on behalf of Eric Walker. I'll be arguing the joint trial issues and Mr. Walker's individual issue. Turning first to the trial, the record is clear that Juror 70 should have been struck for cause because of his admitted bias towards law enforcement witnesses. Again, the test is clear. There needed to be final, unequivocal assurances of impartiality in order for Juror 70 to be seated. And here that did not happen. In fact, this case was really similar to the very candid. And he said that he would try to be fair. He wanted to be fair. He understood that he should be fair, but he never wavered from his adherence to the fact that because he was a 30-year retired police officer, it would be hard for him not to give police officer witnesses the benefit of the doubt. Can I ask you a question, though? Looking at the what the judge's job is, one possibility, as you're stressing, and we've used this term a lot, is final, underscore in italics, unequivocal assurances. And the last words out of Juror 70's mouth were certainly not any kind of assurance that he would fail to, well, that he would be fair. He was saying, yes, sir, if you want an honest answer, I'd be more than happy to leave a police officer. The other possibility, and I see hints of this in some opinions, is that what the district court judge is supposed to do is kind of look globally at everything that particular juror has said, here, Juror 70, and try to make an assessment of that juror's position based on everything that was said, maybe not the last words out of his mouth, literally. So which is it, and does it make a difference here? If I could answer your latter question first, I don't think it makes a difference here, so I don't think that it's necessary for this court to decide that. I do think the word final has to mean something, so that it is important kind of where it's left. Thompson also talks about not leaving things dangling, and said that that was Martina Salazar as well, where kind of like the matter evolved, and then at the end it was really, there was just no great assurance at the end, one way or the other, and that's not enough. But I don't think that it matters here, because I really think if you look overall at what Juror 70 was saying, I think he was really a credible guy, and he was saying, look, the overarching, I think he even used the term, the overarching thing I'm really trying to get at here is that I want to be fair, I want to have an open mind, I want to be, you know, I know I'm supposed to do this, I'm a police officer, but I don't think, I think it would be hard for me to do that, and I probably would end up leaning a little bit more towards the police officer. So I think it's a good question, and I think, you know, I'd like to say that the word final does need to do some work here, but I think either way you look at it in this case, I think he should have been struck. Again, you know, at the very least, I think we don't have those final unequivocal assurances, and the judge needed to follow up more and say, okay, you said that you would, that you have this inclination, you probably would be more inclined towards the police officer witnesses. Do you think you'd be able to set that aside for the duration of the trial and view each witness the same way? And there wasn't that here, so I think at the very least the court couldn't leave it hanging the way it was, but I think if you look at the overall, you know, even his just looking at the totality of his responses, I don't think you ever have those final unequivocal assurances, and you can't just pick out one word, I agree with that, you know, whether it's final or not. You can't say, okay, here's one phrase he said, therefore he's impartial. If you look at it overall here, he was very clear, this would be hard for him. He would have been a great juror for the Thompson trial, right? You know, employment discrimination. Hey, put him on the jury there, and bring the Thompson juror over here. We're not trying to say he would have been disqualified in every case, but this was a case where the majority of the government's witnesses were law enforcement personnel. Juror 70 was chosen as the jury foreman, you know, understandably, because of his 30 years experience as a police officer, undoubtedly. And, you know, we don't have to show prejudice, but I think it's pretty clear here that that could have made a big difference, and the defense was out of its peremptory strikes. Ms. Eisman, I'm looking at, on the record, page 156, 57 of the voidere, where the court asks the juror, so the question is, can you listen to the testimony here, judge each witness by their testimony, how they present themselves, how it aligns with the other evidence, and so forth? Juror 70 says, yes, because I think the truth is the most important thing here. The court says, so you can do that with an open mind? Juror 70, yes, sir. How is that equivocal? I think that that is equivocal by itself and in the context of the rest of the things that he said. He's not saying here that he's able to suspend his belief in favor of law enforcement witnesses for the duration of the trial. He's saying he can judge each witness by their testimony. I don't know exactly what that means, but that's not saying I view each witness neutrally, and he says he can have an open mind, but then immediately thereafter, even when the judge is still questioning him, he kind of goes back on that, and he hedges, and he equivocates, and he says, the judge says the same thing, can you judge each witness by their testimony? I can find the page if I need it. But he says that, no, I think that I can have an open mind, and I believe for the sake of argument that some police officers lie. So even when the judge is still asking him questions, he follows up, because that was just his initial responses. The judge follows up. He says, well, yes, I think I can judge each witness by their testimony, but I'll agree, you know, when it's the presumption of innocence, he says, yes, I can do that. When it's this judge each witness by this testimony, he's got explanations. He's referring to his experience. So the, I mean, I agree that the record, that their statements, I think that can be construed either way, but that's the job of the district court, right? I mean, the district court is there. I've been there many a times myself, conducting voir dire, and the district court judge seems to me to be in the best position to assess the demeanor of the juror, how the voir dire is going, and to weigh those credibility determinations. And it seems to me that our cases do give quite a bit of deference to the district judge in those circumstances, because we don't have the juror before us now. We weren't there. I agree with you about credibility, but this is not at all about credibility. Well, it's a weighing of statements, right? It's about, district judges do that all the time, is weighing statements that might be intentions of one or the other to come to some sort of decision. Well, but there has to be a line for abuse of discretion too, and you have to have those final unequivocal assurances. Otherwise, the appellate review doesn't mean anything. So what we have here is if it would have been a credibility issue, if we would have said, you know, he said X, but we really think he meant Y, then I agree with you. We've got to defer to the district judge on those sorts of things. But like in Thompson, this court in Thompson had the same thing. It said, it's important to note this is not about credibility. We believe absolutely everything he said, and we're taking the transcript at total honesty, right? But he says this is going to be hard. He says he's not sure if he can do it. He says he probably would be inclined to lean more towards the law enforcement officers. And we've got to believe that. The judge said he was credible. But it's important. Look also what the judge said. He said, I think he will be fair, and I think he will try his best. Okay. First of all, he didn't say he will be fair. He said he wanted to be fair. So that's not correct. Second, he said he will try his best. Try his best is not the standard. We need more than that for the Sixth Amendment right to mean something here. Could I reserve the rest of my time for rebuttal, please? Certainly, counsel. Okay, thank you. Mr. Bunt. Thank you, Your Honor. May it please the court and counsel for the government, I represent Clifford King. In addition to the reasons raised by counsel for Mr. Walker, with which Mr. King fully joins and adopts, there is a further reason that this court should reverse Mr. King's motion. The District Court erred in denying Mr. King's motion to suppress. In United States v. Zamudio, this court indicated to all courts that there has to be more for the probable cause analysis to mean something than just the defendant is a drug dealer and he lives at a known residence. In Zamudio, this court found that the law enforcement officer's training and experience, which he attested to, formed a belief within the law enforcement officer that other evidence was likely to be found at the defendant's residence. The District Court held that that was sufficient. But Mr. Bunt, I'm a little bothered by this argument that you've stressed in your briefs. Because honestly, next time, if we said every time the police officers say, based on my training and experience, X, you would rightly say, that's pretty boilerplate. I mean, of course they have training and experience. And so I'm having trouble very much on that. What I'm also having trouble with, getting down to the nuts and bolts of your argument, is the fact that there seems to have been in the warrant at least one transaction in the house. And that's more than talking on the phone in the house. It's more than just saying he's a drug dealer and here's where he lives and so we're going to search. Isn't that enough to put it over the line, the fact that there was this, I think it was two pounds of meth? Well, answering your second question first, Your Honor, no, I don't think that's enough. Because that transaction happened a month before the search warrant affidavit was sought. And it also happened during a time frame where the same law enforcement officer who had affirmed the validity of the search warrant affidavit had made a wiretap affidavit application to the District Court judge and said that it was unlikely that because he used a stash house. So I think the short period of time, the fact that there's no dispute in the record that drugs were not dealt out of Mr. King's residence, he had an encounter with, I believe it was co-defendant Granger at his residence, and then drove off to a different location 11 minutes later, coupled with the length of time. But you're not saying that that's not a way of using the house, surely? I mean, it wasn't putting his stash there, but the house was a point of operations. It was a point of contact for that loan drug transaction. I will concede that, Your Honor. Addressing your first question about whether or not that sort of boilerplate language is enough, I'd like to see a rule that in future cases, the law enforcement officer not only has to rely on his training and experience, but has to say based on his experience and exposure to the overall investigation, what is likely to be found in a particular defendant's house. You know, in this case, the law enforcement officer sought the search warrant for Mr. King's house in conjunction with the search warrant for, I believe, 15 other residences at the same time. And it was all based on a three-month-plus-long lawyer tap investigation where the officer was intimately familiar with each person's role in the alleged conspiracy and what they were doing. So certainly he had the background information where his training and experience would have meant something, and he likely would have been in a position to say what was likely to be found in Mr. King's house. But on this record, he just didn't do that. And I think that under this Court's holding in Zamudio, there just needs to be more, and there wasn't in this case. Remand for resentencing in Mr. King's case is also appropriate because of two errors that the district court judge made at sentencing. The first is that he extrapolated the detailed based on ambiguous testimony from the cooperating witness wherein she stated essentially that on some occasions she received a pound of methamphetamine from Mr. King. On some occasions it was more than that, and there were some days where there was no transactions taking place at all. This cooperating witness also had an independent dealer. The record was clear that Mr. King was not her only source of supply. And the record established based on that months-long wiretap investigation that there were in fact weeks where she and Mr. King did not conduct transactions. So to take her testimony, which was equivocal on that point, and say that it establishes a one pound per day amount for Mr. King. But she actually testifies to quite a bit more for some days. Some days she said two, three, four, maybe five pounds. That's a lot of meth. And so smoothing it out, the district judge thinks he's being generous, actually. He says this is really an understatement from what evidence he was hearing. The record does indicate that the district court judge thought that he was being generous. However, and again, the PSIR laid out a very detailed recitation that matched the trial evidence. And this is an investigation that went on for four months. So they knew that during that four-month period there was one day where in one transaction Mr. King and Mr. Granger met with the cooperating witness and dealt three pounds of methamphetamine. There was one day where that happened. There wasn't multiple days. And again, this is a cooperating witness. So the judge had the opportunity to hear all the witness testimony. But that is what the record established. So I don't think that the district court judge was in fact being generous when he made that extrapolation. And again, this is the highest base offense level for a drug dealing defendant. And so I think more is required before a district court judge can arrive at that level. And then lastly, the district court judge also enhanced Mr. King's sentence by two levels for possessing the same firearm, which formed the basis for a separate count of conviction for which Mr. King was separately sentenced, which this court held in the United States v. Bustamante is improper. So that's another enhancement. And the combined effect of those enhancements that the district court erroneously made would have made a difference to Mr. King's in a different guidelines range. So your honors, if there are no further questions, I'll just reserve the remainder of my time and pass the argument to Mr. Grohman. Certainly. Thank you. Mr. Grohman. Thank you, your honors, and may it please the court. My name is Chris Grohman, and I'm arguing on behalf of Mr. Derek Granger. I'm here not only joining the issues of co-counsel, but also arguing that the government failed to put forth sufficient evidence to convict Mr. Granger of what they actually charged him with in this case, which is conspiracy to distribute methamphetamine, not merely distributing methamphetamine. The government points to several factors that came out of trial that the government believes shows that Mr. King and Mr. Granger had an agreement to distribute methamphetamine, meaning that they were on the same side of the transaction. So, Mr. Grohman, correct me if I'm wrong, but I thought that the district court did give a buyer-seller instruction in this case. That's correct, your honor, but the buyer-seller instruction doesn't cure all. The district court and this court still needs to evaluate whether or not there was sufficient evidence put forth at trial for a reasonable jury to conclude, even with the buyer-seller instruction, that there was a conspiracy here. And I don't think they've met that standard. Let's just sort of briefly talk about what the government points to in its response brief. First, they point to the fact that Mr. Granger gave drugs to Mr. King knowing he was going to resell it. That's how every transaction works, unless you're giving it to somebody who's actually going to use it. As this court pointed out in La Chuga, just giving drugs to somebody knowing they're going to resell it is not enough. Second, they point to the repeated nature of the Again, there could be arm's-length sales each time. Just the fact that they constantly deal with each other is not enough to show conspiracy. And last, they point to the March 4, 2020, conduct where Mr. Granger accompanied Mr. King to meet with Ms. Dowling, and that was clearly on credit. But again, one transaction that's on credit is not enough to show a conspiracy, especially in light of the fact that Ms. Dowling testified that she paid cash 50-50. There's no evidence of what the arrangement was between Granger and King in terms of credit, other than that this one single incident was on credit. Lastly, the government points to the fact that Mr. Granger helped Mr. King in that particular transaction. I'm not exactly sure what help he provided based on the record. He certainly accompanied him there, but he didn't count the cash, he didn't give the drugs to Ms. Dowling. And in summary, there is just simply not enough here for a reasonable jury to have concluded that this was a conspiracy as compared to merely a Thank you, Mr. Grohman. Mr. Wright. May it please the Court. Brian Wright for the United States. I plan to progress through the issues in the same order that the defendants did, starting with the juror issue. On that, Judge Wood, I want to start right with your questions. I think that gets somewhat to the crux of the matter. The analysis is global. In other words, it's not the final assurances, it's not a literal last-in-time requirement. Why is the word final used then? I mean, there's been a discussion, and if at the end of the day the person winds up saying, in summary, I'm going to give more credibility to the police officers. It didn't quite say that, but it sounded like it. We have a specific and a general reason why it is global. First, specifically, we would point the Court to Griffin v. Bell. The same chronology there occurred. The jury most likely believed the police officer. Then the Court inquired, and they gave assurances at that point that they could be fair and impartial. The defense attorneys then questioned them, and they went back and said probably would give more credence to a police officer. The Court did not say that those jurors were improperly seated, even though their final statements were equivocal. So based on Griffin, that's a specific case where the final does not mean last word. And I also want to talk about the general standard. I think from the standard review from the Supreme Court and this Court, I think really conflicts with that final because judges, or first of all, jurors understandably are not required to be consistent or clear, and some wavering is acceptable. Judges can value statements made to them more than other credit, statements made based on leading questions. And so all of those, I think, factor into the idea that the judge is not required to hyper-focus on the very last statement. If that was true, then I don't really know what discretion the judges would have. They would really— Well, to interpret that last statement, but what bothers me is looking at Juror 70. He keeps coming back to this theme. You know, I was on the force for 30 years. Police officers are vetted. I didn't think the government's explanation of what that meant was overwhelming. And he keeps saying, you know, they are trained to tell the truth. And I, you know, the bad apples, he more or less says, you know, have been weeded out by the time they've been on the force for a while. This isn't just a stray statement that he makes at the end of the discussion that conflicts with everything else. It's a theme. There is no doubt, and we didn't have an inclination or pro-police beliefs. I would step back and say, I would caution the court to think about that because it would be hard in my mind to write a rule here that wouldn't essentially exclude all retired police officers. Because I think police officers that are being honest with themselves are going to have similar views to this. I think it's a natural, innate human instinct to value in-group statements over out-group statements. So I think that you're going to have police officers say things like this a lot. And this court or no court has ever said that prior employment or even current employment... No, no. I don't think that. I mean, but some people do manage to say, I'm not going to go in with any priors about which witnesses are credible and which aren't. I'm just going to listen to the testimony. That's what you want. I mean, look, if you read the newspapers, I would suspect that there are some people who might be in a jury denier who would say, if it was a police officer, I was assuming he was lying. As an aside, we actually recently had one of those and that jury wasn't struck for cause. We had to use the peremptory. So I think it does work both ways. It could happen either way. Yes. But those either way are prior beliefs, not biases. And because of that, we can look to whether it was unequivocal statements. What's the difference between a prior belief and a bias in your opinion? I think what this court said in Thompson, a bias is unshakable, adamant, irrational. Something like, no matter what I hear, I'm going to believe the police officer. And that is not what the juror said here. He admitted that some police officers lie. He said for the sake of argument. He said more than that. It was a pretty weak admission, if that's what he was. That wasn't the only one, Your Honor. In his first statement, without any pushing, he said, so yes, police officers lie and pointed to issues in the news. He said, the majority take their oath seriously. All that left room for the possibility that some did not, and that is not irrational or adamant or unshakable. So therefore, we can look to what Judge Lee pointed to. There were unequivocal assurances. The colloquy with the judge at 155 to 157, the juror said there was no presumption with any witness. He said that he can have an open mind and judge the evidence impartially. The district court is in the best position to weigh those statements. That is a credibility determination, and that is very difficult, I think, under the standard of view for this court to reverse. If there's no further questions on the juror issue, I think I can briefly move through the remaining issues. The suppression issue, Mr. King, I think it explicitly contradicts Zemudio. Zemudio says there does not have to be a direct link between the location and the evidence of the drugs. Drug dealers, trial courts can presume that drug dealers store evidence of their drugs or their crime at a residence. Here, we actually have more than that. We have a drug dealer. Let me just interject, though. I'm a little worried about the momentum of this idea that drug dealers are likely to keep evidence of their business, so to speak, at their residence, because we have said that you need more than that. You need more than just saying, Jones is a drug dealer, therefore we can search his residence. I'm not sure what that more is because the government keeps coming in. Certainly, I don't think it could mean that if the police officer just encants, and by my training in residence, I expect to find evidence. I just think that's silly. Maybe we have more here, but I don't know what. I'm very worried that it's turning into just a per se rule. Let me start by saying we do have more here, so I'm not sure that's an issue for this particular case. On the other, I argued Zamudio, and not to put myself in this case again, but I was asked that question. I still think it's difficult to conceive of the situation that that rule wouldn't apply. I think you would probably need evidence in a wiretap that would preclude or exclude any inference that the drug dealer had any evidence at his home. I think without something like that, the inference is, to me, so obvious that criminals likely keep some evidence of their crime at their home that there almost has to be something in the record that would dispute that. It's not even clear to me that that's true, though, because a lot of this business is done using cell phones, and if you're just standing there in your house talking on the cell phone, I don't know why that leaves a footprint in the house. Something's in the air, and it's bounced up onto a cell tower, so that's not your home. Well, the cell phone itself is attribution evidence, I would say, so we got a wiretap. But most people have their cell phones surgically implanted into their hands. They're never away from them. I'm probably one of those people half the time. I think we all are like that, but beyond the cell phone, other drug ledgers, I don't think we should presume that all drug I think there's just a lot of evidence that might be relevant. Isn't that speculative? Again, if you're using the cloud to store these things, you have some appropriate passwords on stuff. In today's world, it's just not clear to me that you can just say, he lives here, therefore there's going to be evidence. You seem to be flipping the burden, saying, no, he has to say, well, actually, I have three young children at house. I take every effort not to do anything in my home, something like that. I don't intend to be flipping the burden. I just think the inference is so strong, and really, that's what the court has said for years. I mean, Zamudio didn't come out of the blue. Zamudio is built on years of precedent. I really think that's the scenario we're looking at. There may be others. Maybe Uranus is onto something with there's no evidence that he does anything but speak on the phone. Maybe then. Sure. Maybe then. But if it's a normal mine run case like here, actually, this is above the mine run case because we have a drug deal occurring. We have the drug deal at the house, which I recognize makes this not the case that I'm even more worried about. Yeah. We aren't fighting against the idea that it's a blanket rule. I just think that the inference is so strong, the blanket is covering most of the bed. Maybe mixing metaphors. Mr. Reach, can you address, before we leave on Mr. Walker, one of the issues that Mr. Walker raised was how the district court calculated the drug quantity amount. For Mr. Walker. For Mr. Walker. Right. So we think there were three ways to get there. No, I understand you think there are three ways to get there, but the way the district court got there was he basically attributed the entire conspiracy, what he calculated to be the entire conspiracy amount to Mr. Walker without doing some additional fact finding with regard to either foreseeability or other factors that the sentencing guidelines would like, would prefer that he do. I think it's fair that unlike Mr. King's drug quantity, Mr. Walker, the way the court did it is based on an inference on an inference. So what we can say, we know that for the short period of time when the wire taps were in effect, Mr. Walker dealt a significant amount of drugs. I think we can also say based on his early wire taps, his status in the conspiracy was pretty long standing. The first wire tap, so we got a wire tap that went on February 6th. Three days later, Mr. Walker is on the wire tap with Mr. King instructing him about a customer payment. The next day, he's telling Mr. Walker, you had a warrant, don't pull a gun. Three days later, he's telling Mr. King how to play Miss Adams and use her until she's arrested. So there's certainly an inference that Mr. Walker's involvement in the conspiracy lasted well before those six weeks. But what is the best evidence that to the extent that the certain drug quantities can be attributed to Mr. Granger, that they should also be attributed to Mr. Walker? Because the evidence is that Ms. Dowling, Mr. King received drugs from both, right? And so what's the evidence that various quantities could be segregated out with regard to Mr. Walker versus Mr. Granger? It does take some reasonable extrapolation, but I'll point to two things. We do know Walker knew there was another supplier. There's a comment on a wire tap to Mr. King that indicates as much. And I understand the defense has a problem with it, but during the time period of the conspiracy, there was a photograph of the three together, which supports the idea that Mr. Walker knew of another supplier. One picture? I mean, really, that seems a little crazy. I, well, I don't, if that is a proof beyond a reasonable doubt, certainly I think that's pretty thin. But at sentencing, preponderance of the evidence when you factor in the phone call that Mr. Walker identified or acknowledged another supplier, it stands to reason that if he's pictured with the other supplier and Mr. King during the time frame of the conspiracy, he might not know it's Granger. Though, of course, he doesn't have to know who the supplier is. It's whether it's reasonably foreseeable that there are more drugs coming into the conspiracy. And Mr. Walker, it was reasonably foreseeable to Mr. Walker that more drugs were coming to King than just him because he knew there was another supplier. Well, there are actually several other suppliers. Correct. But, so did you search the phone to see who else he had pictures with? He must have had pictures with tons of people. Yes. I mean, going back to your honest point, our phones are attached to our hands and we have pictures of a lot of people. But I think it is, again, not beyond a reasonable doubt incriminating, but you, I think three members, the three, like, top level members of the conspiracy pictured together during the course of the conspiracy is indication that they know each other and are working together. Again, we're not saying that by itself proves beyond a reasonable doubt, but we have to prove preponderance that is reasonably foreseeable. And I think that's an indication that Mr. Walker knew there was another drug supplier and that made it reasonably foreseeable to him. I would add that I don't... A lot of inference in there, I just have to say. I started by saying, unlike Mr. King, I think there's an inference based on an inference. I would step back and say, if the court is unhappy with those inferences, we would just point to the drug weight and the fact that he dealt 16 pounds of drugs and it was 97, 95% pure weight. Yeah, but that argument, I mean, as Judge Lee was saying, that wasn't remotely what the district court relied on. Correct. We advanced that argument. That's not what the district court did. The court can affirm on any grounds. I think that's a clear ground in the record. We argued it and Mr. Walker didn't respond to it in any way. And I think it's pretty hard to respond to other than this idea that the court should reject the guidelines based on a policy argument. But of course, Mr. Walker didn't make that argument below. So we would say that's way... It really only takes two things in the record for us to get over the limit for level 38. That's one, the amount of drugs that Mr. Walker himself dealt. I see no argument that that's not the correct number. And then the purity levels, which the drugs down the line were that pure. I don't see any argument that that was incorrect factually. So you put those two together and Mr. Walker clears the level 38. I think that's a cleaner way. If I was the court, that's the way I would have done it. I don't think the way the court did it was wrong. I think the court could have also picked the third way. But if the court is worried about the inferences on extrapolating to the reasonable foreseeability of all the drugs, I think the court can definitely look at the purity argument. Just briefly on Mr. King's drunk quantity, I alluded to that. His is based on actual testimony at trial. Mrs. Dowling, sure, she said zero to five pounds. It only has to be... The judge put it at a pound, which I think was conservative. That was three times more than the level. So it actually has to be less than a third of a pound a day for a year for Mr. King to go down an offense level. And I think if that was the case, we might have appealed because that would have been an unreasonable clear error factually. I think one is a conservative estimate that's well supported by the record. The gun bump we think is different than Bustamante. Of course, it doesn't matter if the drug quantity is right because those two levels don't impact his guideline range. So I would understand the idea the court maybe doesn't want to mess with the edges of Bustamante, but the court can easily find that that was harmless error. There's nothing on that Mr. Granger's sufficiency argument. I think the March 4th transaction says everything. Mr. Granger helped King transport drugs to a drug deal. There, he oversaw as the drugs were resold. I think Mr. Granger's reply brief on page two essentially admits as much. He says there's a one-off where he went with King to make sure the drugs were resold. That's a conspiracy because he worked with a middleman to sell the drugs for their down the line. If the court has no questions about the issues that were unraised at argument today, we're happy to address them. Otherwise, we would rest on our brief for those issues. Thank you. Thank you, counsel. Ms. Eisenman, anything further? Yes, please. Just two quick things. First of all, the government's contention that if you couldn't strike or had to strike Juror 70, in this case, you would have to strike all cops with this much experience. I vehemently disagree with that. This was a detailed discussion. This was a juror who was grappling honestly with the fact that he personally didn't think that because of his personal experience, he could set aside that. You could imagine tons of different scenarios where police officers with the same amount of experience would be able to say, you know what, yes, I had that experience, but I think for this trial, I could set that aside. That did not happen here. Thompson says if you don't have those final unequivocal assurances of impartiality, you don't defer to the district court. You reverse, you get a new trial because the Sixth Second point just on the drug quantity. Again, we're forgetting the standard a little bit here. Helding says that district courts, when they're calculating drug quantities, they have to take care in making these determinations. The government's got tons of reasons why this should be upheld, but this court is not in the business of calculating drug quantity. The district court has to do that work. The district court did not do that work here. All the district court said was based on Dowling's testimony, but as Judge Lee pointed out, King, Dowling didn't know who the suppliers were. King had multiple suppliers. There were three different meth suppliers. There was no evidence that Walker was involved beyond those 16 specific transactions. We have 16 transactions. Thank you. Why are we extracting? Thank you. Sorry. Mr. Bond. Thank you, Your Honor. Very briefly in conclusion, I think Zamudio clearly indicates that something more is required and the record in this case reflects that the only something more in this case is one 14 minute meeting with Granger that took place one month prior to the application for the search warrant. I think in my opening I may have indicated that it was one month prior to the search warrant actually being executed, but it was in fact one month prior to the execution for the search warrant or the application for the search warrant. Sorry. And again, that was during the same period of time when the same attesting officer said that it was unlikely that any evidence of drug distribution was likely to be found at King's house because he uses a stash house. So for those reasons, I think this case is different and I just don't think that's enough. Thank you. Thank you, Mr. Bond. Mr. Groman, your time has expired. The court wants to express appreciation to all three of you, Ms. Eisenman, Mr. Bond, Mr. Groman, for your willingness to accept the appointment in this case and your assistance to the court as well as your client. The case is taken under advisement.